# Illinois Official Reports

## Appellate Court

*BorgWarner, Inc. v. Kuhlman Electric Corp.*,
**2014 IL App (1st) 131824**

| | |
|---|---|
| Appellate Court Caption | BORGWARNER, INC., and KUHLMAN CORPORATION, Plaintiffs and Counterdefendants-Appellees, v. KUHLMAN ELECTRIC CORPORATION and KEC ACQUISITION CORPORATION, Defendants and Counterplaintiffs-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1-13-1824 |
| Filed | December 8, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a dispute arising from an indemnification agreement for toxic tort liability included in a merger agreement with respect to a manufacturing site in Mississippi that plaintiffs initially had purchased and then sold to defendants, the trial court did not err in denying defendants' motion for a protective order and requiring defendants to provide plaintiffs with documents pertaining to the polychlorinated biphenyl contamination of the site and the lawsuits seeking damages from the contamination, since neither the attorney-client privilege nor the work-product doctrine applied in the instant case, and, therefore, the order compelling disclosure of the documents was affirmed and the contempt order was vacated pursuant to Supreme Court Rule 304(b) based on defendants' good faith in appealing the issue. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-8893; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed in part; vacated in part. |

Counsel on Appeal  Latham & Watkins, LLP (Thomas J. Heiden, Mary Rose Alexander, Michael J. Nelson, Andrew J. Mellen, and Robert C. Collins III, of counsel), and Figliulo & Silverman, PC (James R. Figliulo, of counsel), both of Chicago, for appellants.

Tabet, DiVito & Rothstein, LLC, of Chicago (Caesar A. Tabet, Daniel L. Stanner, John M. Fitzgerald, Katherine M. O'Brien, and Ashley Crettol Insalaco, of counsel), for appellees.

Panel  JUSTICE CUNNINGHAM delivered the judgment of the court with opinion.
Presiding Justice Delort and Justice Harris concurred in the judgment and opinion.

## OPINION

¶ 1  This appeal arises from the February 21, 2013 order entered by the circuit court of Cook County, which denied a motion for protective order filed by defendants Kuhlman Electric Corporation (KEC) and KEC Acquisition Corporation (KAC) to protect from disclosure certain allegedly privileged documents requested by plaintiffs BorgWarner, Inc. (BorgWarner), and Kuhlman Corporation (Kuhlman) and granted BorgWarner and Kuhlman's motion to compel KEC and KAC to produce these documents, in a dispute arising out of an indemnification agreement for toxic tort liability. This appeal also arises from the circuit court's May 2, 2013 order finding KEC and KAC in direct civil contempt for refusing to comply with the court's February 21, 2013 order to produce the documents. On appeal, KEC and KAC argue that the circuit court erred in denying their motion for a protective order and requiring them to provide BorgWarner and Kuhlman with the privileged documents. For the following reasons, we affirm in part and vacate in part the judgment of the circuit court of Cook County.

¶ 2             BACKGROUND

¶ 3  This case involves a complex procedural background and only the most pertinent facts are set forth in this opinion. For the past 50 years, KEC has owned and operated a manufacturing site in Crystal Springs, Mississippi (the Crystal Springs site). In March 1999, BorgWarner purchased Kuhlman and all of its subsidiaries, including KEC, which represented to BorgWarner at that time that there was no contamination on its property.

¶ 4  Shortly thereafter, pursuant to an August 30, 1999 "Agreement and Plan of Merger" (the merger agreement), KAC purchased KEC from BorgWarner and the sale transaction closed on October 5, 1999. In the merger agreement, KEC represented that it was in compliance with environmental laws and that it had no "material liability" at the Crystal Springs site. Pursuant to the merger agreement, BorgWarner and Kuhlman agreed to indemnify KEC and KAC for

certain preclosing environmental liabilities and to pay reasonable fees and costs in connection with those matters. KEC and KAC in turn agreed to indemnify BorgWarner and Kuhlman for any damages, penalties, fines and liabilities as a result of "any breach of or other default under any covenant of [KEC] contained in this agreement." The merger agreement provided that the parties' obligations would be governed by Illinois law.

¶ 5    On April 19, 2000, KEC and KAC sent a letter to BorgWarner and Kuhlman stating that KEC had "become aware of facts that may give rise to claims for indemnification" based on the discovery of polychlorinated biphenyl (PCB) contamination in the soil at the Crystal Springs site. The April 19, 2000 letter was the first time that either KEC or KAC had given BorgWarner or Kuhlman any indication of potential contamination at the Crystal Springs site. KEC and KAC represented to BorgWarner and Kuhlman that they had no prior knowledge of any environmental contamination at the Crystal Spring site. Beginning in 2001, as a result of the PCB contamination, thousands of toxic tort lawsuits were filed against KEC, BorgWarner and Kuhlman, seeking compensation for personal injury and property damage that were allegedly caused by the PCB contamination at the Crystal Springs site (the underlying tort actions). Pursuant to their duty to indemnify under the 1999 merger agreement, BorgWarner and Kuhlman retained the law firm of Seyfarth Shaw to jointly defend them and KEC in the underlying Mississippi tort actions. Based on KEC and KAC's representations that they had no prior knowledge of the contaminants at the Crystal Springs site, and subject to a reservation of rights, BorgWarner and Kuhlman spent millions of dollars defending against the underlying tort actions, as well as conducting clean-up and remediation activities at contaminated properties in Mississippi. During defense of the underlying tort actions, KEC and KAC continued to assert the position that they had no prior knowledge of the contamination.

¶ 6    In February 2004, in response to a subpoena issued in the underlying tort cases, KEC's environmental counsel, Dickinson Wright PLLC (Dickinson Wright), revealed that it possessed an environmental report which, as a result of environmental testing performed in 1988, documented the presence of contamination at the Crystal Springs site (the Stalwart Report). As a result of the conflict of interest created by the Stalwart Report, Seyfarth Shaw ultimately withdrew as lead joint counsel for BorgWarner, Kuhlman, and KEC in the underlying Mississippi tort actions, and the parties retained separate counsel while continuing to jointly defend in the underlying tort actions. In July 2004, BorgWarner and Kuhlman entered into a "Joint Defense and Confidentiality Agreement" (JDCA) with KEC and KAC, in order to outline the parties' common interest relating to the underlying Mississippi tort actions and to reduce to writing the basis for the necessary exchange of privileged information in furtherance of their common interest in the underlying tort actions. The 2004 JDCA stated that the parties agreed to be bound by the JDCA as it related to all litigation brought by third parties against them alleging personal injury and property damage associated with contamination at the Crystal Springs site, as well as any claims by BorgWarner, Kuhlman, KEC or KAC against insurers relating to the underlying tort actions.

¶ 7    In 2006, BorgWarner filed a separate lawsuit in the circuit court of Cook County against KEC's former attorney, Dickinson Wright, alleging fraud and legal malpractice (the Dickinson Wright lawsuit). See BorgWarner, Inc. v. Dickinson Wright PLLC, No. 06 L 4663 (Cir. Ct. Cook Co.). In the Dickinson Wright lawsuit, BorgWarner claimed that Dickinson Wright, with which it had an attorney-client relationship, knew of the PCB contamination at the Crystal Springs site as early as 1988 but concealed the information from BorgWarner. In May 2008,

- 3 -

Dickinson Wright filed a third-party complaint against KEC, and KEC sought defense and indemnification for the Dickinson Wright lawsuit from BorgWarner and Kuhlman. During the course of discovery in the Dickinson Wright litigation, BorgWarner sought to compel disclosure of certain KEC documents over which KEC asserted attorney-client privilege. The Dickinson Wright court ruled that certain information sought by BorgWarner was protected from disclosure by KEC's privilege. In 2009, the Dickinson Wright lawsuit was dismissed pursuant to a settlement agreement.

¶ 8    On August 3, 2010, BorgWarner and Kuhlman filed a five-count complaint against KEC and KAC in the instant case. Each count related to an indemnification dispute under the 1999 merger agreement and concerned the environmental contamination at the Crystal Springs site. In count I, BorgWarner and Kuhlman sought damages for KEC and KAC's alleged breach of the merger agreement and for a declaration that they have no obligation to defend or indemnify KEC and KAC under the merger agreement for or against any expenses and liabilities incurred by KEC in the underlying tort cases. BorgWarner and Kuhlman further sought damages for KEC and KAC's breach of their duties to provide full access to all environmental information and to fully cooperate with BorgWarner and Kuhlman under the merger agreement. In counts II to IV, BorgWarner and Kuhlman sought declaratory relief regarding the scope of the indemnification provisions in the merger agreement. BorgWarner and Kuhlman alleged that they had no duty to defend or indemnify KEC and KAC against claims in the underlying tort actions relating to KEC and KAC's intentional misconduct, willful and wanton acts or omissions, or gross negligence, nor had a duty to defend or indemnify claims brought against KEC and KAC for punitive damages and asbestos exposure. BorgWarner and Kuhlman also alleged that they had no duty to defend or indemnify KEC for claims brought against KEC in the Dickinson Wright litigation. In count V, BorgWarner and Kuhlman sought a declaration that they were not required to defend or indemnify KEC and KAC for expenses or liabilities incurred relating to additional groundwater plume contamination caused by solvents leaked off-site from the Crystal Springs site. They claimed that such indemnity and defense exceeded the "quantum and geographical boundaries" of the contamination that existed on the October 1999 closing date of the sale transaction by which KAC purchased KEC from BorgWarner.

¶ 9    In response, KEC and KAC asserted multiple affirmative defenses and counterclaims against BorgWarner and Kuhlman. In the affirmative defenses, KEC argued that it worked with BorgWarner for years to jointly defend against several thousands of underlying Mississippi tort actions and to lessen the liability exposure of both BorgWarner and KEC to those claims. KEC and KAC claimed that they allowed BorgWarner access to KEC's facility, records, employees, and counsel for the investigation and defense of those claims. They further argued that under a separate cooperation agreement signed by the parties in 2005, BorgWarner released any claim for recoupment of amounts already spent in the underlying tort actions. KEC also asserted that it complied with all of the court's discovery orders in the Dickinson Wright litigation and that the circuit court which presided over the Dickinson Wright litigation had exclusive jurisdiction to resolve disputes relating to those matters. In their counterclaims, KEC and KAC alleged that BorgWarner breached the 1999 merger agreement by refusing to indemnify them for the Crystal Springs contamination claims. They also contended that BorgWarner breached the 2004 JDCA. Further, the counterclaims alleged that BorgWarner and Kuhlman, at the time they still owned KEC, falsely represented to KAC that there was no environmental contamination at the Crystal Springs site and that they would fully protect and

indemnify KEC and KAC if contamination was present. KEC and KAC also alleged that BorgWarner and Kuhlman acted in bad faith to increase KEC and KAC's liability exposure, and asserted claims for fraud, conversion, and disclosure of confidential or privileged information. KEC and KAC also sought a declaration that the 1999 merger agreement required BorgWarner and Kuhlman to indemnify them for all present and future claims regarding pre-closing environmental conditions; that BorgWarner and Kuhlman had waived any and all claims to recoup costs; that BorgWarner and Kuhlman must indemnify them for any settlement payments made; and that BorgWarner and Kuhlman must indemnify them in the underlying tort actions.

¶ 10 During discovery in the instant case, BorgWarner and Kuhlman requested production of all documents regarding the environmental contamination and the underlying tort actions. In response, KEC and KAC refused to produce certain categories of relevant documents that they claimed were protected by the attorney-client privilege and the work-product doctrine. As a result, BorgWarner and Kuhlman moved to compel KEC and KAC to produce the documents.

¶ 11 On June 18, 2012, KEC and KAC filed a motion for a protective order to prevent BorgWarner and Kuhlman from obtaining documents relating to the underlying tort actions on the grounds of attorney-client privilege and the work-product doctrine–including communications that KEC and KAC had with their legal representatives at the law firms of Dickinson Wright, Seyfarth Shaw and Jenner & Block LLP (Jenner & Block) relating to the underlying Mississippi tort actions or the Crystal Springs site; the mental impressions, conclusions, opinions and/or legal theories of KEC and KAC with their counsel at law firm Latham & Watkins regarding the underlying tort actions; communications between KEC, KAC, BorgWarner, Kuhlman, Seyfarth Shaw, and Dickinson Wright; documents relating to the settlement of any claims in the underlying Mississippi tort actions; and materials withheld by Dickinson Wright. KEC and KAC also sought to be relieved of the obligation to produce a "privilege log" on the bases of prejudice and undue burden.

¶ 12 On August 27, 2012, the circuit court ordered KEC and KAC to produce all nonprivileged documents identified in BorgWarner and Kuhlman's requests for documents, and ordered KEC and KAC to prepare a "privilege log identifying the categories of documents they are withholding from production to [BorgWarner and Kuhlman]."

¶ 13 On September 25, 2012, KEC and KAC produced a privilege log, which identified 28 categories of approximately 40,000 documents relating to the underlying tort actions and environmental matters.

¶ 14 On February 21, 2013, the circuit court entered an order denying in part KEC and KAC's motion for a protective order by finding that documents relating to the underlying environmental matters in 22 out of the 28 categories listed on the privilege log must be produced to BorgWarner and Kuhlman. In making its ruling, the circuit court set forth three independent bases to require production of the 22 categories of privileged documents: (1) KEC and KAC's duty to cooperate under the merger agreement; (2) the parties' common interest in the underlying matters; and (3) KEC and KAC's waiver of privilege by putting the privileged materials at issue in their affirmative defenses and counterclaims against BorgWarner and Kuhlman. The circuit court determined that any privileged communications between KEC and KAC with their counsel "generated in preparation for the defense and prosecution of the indemnity claims, including the present indemnity dispute," were the only materials protected from disclosure.

¶ 15         On March 21, 2013, KEC and KAC filed a partial motion for reconsideration, which the circuit court denied on April 11, 2013.

¶ 16         On April 16, 2013, after KEC and KAC refused to produce the documents as required by the court's February 21, 2013 order, BorgWarner and Kuhlman filed a petition for adjudication of direct civil contempt (petition for direct civil contempt) against them.

¶ 17         On May 2, 2013, the circuit court found KEC and KAC in direct civil contempt of court for their noncompliance of the court's February 21, 2013 order to produce the documents, found that they were "acting in good faith for purposes of seeking an appeal under Supreme Court Rule 304(b)," and imposed a monetary penalty of $100. See *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 56 ("exposing oneself" to a finding of contempt is an appropriate method of testing the validity of a court order by making the order appealable (internal quotation marks omitted)). On May 31, 2013, KEC and KAC filed a timely notice of appeal.

¶ 18                                  ANALYSIS

¶ 19         This court has jurisdiction over this appeal pursuant to Supreme Court Rule 304(b)(5), which makes appealable, without the necessity of a special finding by the court, orders "finding a person or entity in contempt of court which imposes a monetary or other penalty." Ill. S. Ct. R. 304(b)(5) (eff. Feb. 26, 2010).

¶ 20         We determine on appeal whether the circuit court erred in denying KEC and KAC's motion for a protective order and in requiring them to provide BorgWarner and Kuhlman with documents in 22 of the 28 categories in KEC and KAC's privilege log. We review this issue *de novo*. See *Janousek v. Slotky*, 2012 IL App (1st) 113432, ¶ 13 (although discovery orders are generally reviewed for an abuse of discretion, a trial court's determination as to whether a privilege exists is reviewed *de novo*).

¶ 21         In its February 21, 2013 order, the circuit court set forth three independent bases to require KEC and KAC to produce documents from 22 out of 28 categories of the privilege log: (1) KEC and KAC's duty to cooperate under the merger agreement; (2) the parties' common interest in the underlying matters; and (3) KEC and KAC's waiver of privilege by putting the privileged materials at issue in their affirmative defenses and counterclaims against BorgWarner and Kuhlman. We may affirm the circuit court's ruling on any one of the three grounds, or on any other basis in the record, regardless of whether the circuit court relied upon that basis or whether the circuit court's reasoning was correct. See *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009).

¶ 22         KEC and KAC argue that the information sought by BorgWarner and Kuhlman was protected from disclosure by the attorney-client privilege and the work-product doctrine. KEC and KAC contend that the parties' contractual agreements did not grant BorgWarner and Kuhlman access to their privileged information; that the circuit court in the Dickinson Wright litigation and in an underlying Mississippi action denied BorgWarner and Kuhlman access to the same privileged information; and that the public policy concerns regarding the prevention of collusion between the plaintiffs in the underlying actions, and KEC and KAC, were not present to compel disclosure.

¶ 23         BorgWarner and Kuhlman counter that the circuit court properly ordered disclosure of the documents in 22 of the 28 categories in KEC and KAC's privilege log. They argue that language in the parties' 1999 merger agreement required KEC and KAC to produce these

documents; that our supreme court's decision in *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178 (1991), required disclosure of the documents; that interlocutory rulings by the circuit court in the Dickinson Wright lawsuit and in an underlying Mississippi action did not control the outcome in the instant case; and that no public policy concerns destroyed KEC and KAC's duty to cooperate under the merger agreement.

¶ 24 Illinois Supreme Court Rule 201(b)(2) govern both the attorney-client privilege and work-product doctrine: "All matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure. Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013). Our supreme court has defined the attorney-client privilege as "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal advisor, except the protection be waived." *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000). The purpose of the attorney-client privilege is to encourage clients to engage in full and frank discussion with their attorneys without fear of being compelled to disclose that information. *Id.* at 584-85. The attorney-client privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client. *Id.* at 585. The work-product doctrine "provides a broader protection than the attorney-client privilege and is designed to protect the right of an attorney to throughly [*sic*] prepare his case and to preclude a less diligent adversary attorney from taking undue advantage of the former's efforts." *Id.* at 591.

¶ 25 Our supreme court's decision in *Waste Management, Inc.* governs our analysis in the case at bar. In *Waste Management, Inc.*, the insureds, which owned and operated hazardous waste materials disposal sites, purchased insurance from two insurance companies. *Waste Management, Inc.*, 144 Ill. 2d at 185. The insurance policies provided indemnity to insureds for defense costs arising out of any environmental claims filed against them by third parties, subject to certain exclusions and conditions, including the insureds' "duty to cooperate." *Id.* The "duty to cooperate" was memorialized in a "cooperation clause," which imposed upon the insureds "the duty to assist insurers in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds." *Id.* at 192. Further, the policies provided that the insurers were entitled "to conduct any claim, in the name of insureds, for indemnity or damages." *Id.* The insureds defended and settled a lawsuit alleging migration of toxic waste from the insureds' waste disposal sites. *Id.* at 186. The insureds later sought indemnification from the insurers for settlement and defense costs in the amount of $3 million. *Id.* The insurers denied coverage, claiming that the insureds had breached the cooperation clause by failing to disclose that the insureds had previously filed and settled a negligent design and construction claim against the prior owner of the property for $1.5 million. *Id.* Both the insureds and the insurers then filed declaratory judgment actions seeking a determination of their rights and liabilities under the policies. *Id.* During discovery, the insurers requested production of the insureds' counsel's files in the underlying environmental litigation. *Id.* at 187. The insureds withheld some of the requested information, asserting attorney-client and work-product privileges. *Id.* The trial court ordered production of the files

relating to the underlying toxic tort case, but denied production of the files relating to the negligent design case against the prior owner of the property. *Id.* The insureds refused to comply with the order, and the trial court held one of the insureds' attorneys in contempt of court and fined him $100. *Id.* The appellate court held that the insurers were entitled to all of the requested documents. *Id.* On appeal, our supreme court held that the attorney-client privilege and the work-product doctrine were not applicable to bar disclosure of the files. *Id.* at 201. The *Waste Management, Inc.* court offered two reasons in finding that the attorney-client privilege did not apply. *Id.* at 191. First, the court concluded that the plain language of the insurance policies' "cooperation clause" created "contractual obligations" requiring the insureds to disclose to the insurers "any communications they had with defense counsel representing them on a claim for which insurers had the ultimate duty to satisfy." *Id.* at 192. The court stated that the clause imposed a "broad duty of cooperation and is without limitation or qualification." *Id.* Accordingly, our supreme court concluded that a "fair reading" of the insurance policies rendered any expectation of attorney-client privilege unreasonable. *Id.* at 192-93. Second, our supreme court found the attorney-client privilege inapplicable in light of the "common interest" doctrine, which provides that "when an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties." *Id.* at 193. The court noted that typically, the "common interest" doctrine applies where an attorney has provided joint or simultaneous representation of the parties. *Id.* at 194. However, the court also found the doctrine applicable where the attorney, although neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer. *Id.* The court concluded that "[i]n a limited sense," the insureds' attorney represented the insurers in the underlying environmental litigation because the insurers were ultimately liable if the plaintiffs in the underlying action received a favorable verdict or settlement. *Id.* at 194-95. Because both the insurers and insureds had a "common interest" in either defeating or settling the underlying environmental litigation, the attorney-client privilege was inapplicable. *Id.* Likewise, the *Waste Management, Inc.* court concluded that the case did not "fit within the parameters" of the work-product doctrine. *Id.* at 197. The court noted that in the typical case, the sought-after material is generated in preparation of trial against an adversary who may seek disclosure of his opponent's work product. *Id.* at 196. However, the materials requested in *Waste Management, Inc.* were prepared for the mutual benefit of the insureds and the insurers against a third-party adversary. *Id.* at 198-99. In other words, because the requested materials were not prepared in anticipation of the declaratory judgment action in which the discovery was sought, the work-product doctrine was inapplicable. *Id.* The court rejected the insureds' claim that the information requested by the insurers "may be gleaned from objective facts, contained outside the contents of defense counsel's files." *Id.* at 199. The court pointed out that "what [the] insurers seek to discover is *** the mental impressions and case assessment of defense counsel" and that there is "no source, outside the files, where this information might be obtained." *Id.* The court added that, even if the work-product doctrine applied, the sought-after materials would still be subject to disclosure pursuant to the "at issue" exception to the doctrine, which permits discovery of work product where the sought-after material is either the basis of the lawsuit or the defense thereof. *Id.* at 199-200. The court held that where, in the underlying environmental litigation, an attorney represents the common interests of two or more clients whose relationship later becomes adverse, and, in a subsequent action, the work product of the attorney is at issue, the work-product doctrine is not available to bar discovery

by one of the original parties. *Id.* at 200. In rejecting the application of the attorney-client and work-product privileges, the *Waste Management, Inc.* court further noted that Illinois has a strong public policy favoring complete disclosure in litigation, such that courts should be mindful that the privilege is not without conditions and "it is the privilege, not the duty to disclose, that is the exception." *Id.* at 190. Therefore, the court noted, the privilege "ought to be strictly confined within its narrowest possible limits." *Id.*

¶ 26    Applying the principles of *Waste Management, Inc.* to the case at bar, we find that neither the attorney-client privilege nor the work-product doctrine barred discovery of the requested documents. Like the insureds in *Waste Management, Inc.*, KEC in the instant case owned and operated a manufacturing site on the Crystal Springs site. Pursuant to the 1999 merger agreement, similar to the insurance policies in *Waste Management, Inc.*, BorgWarner and Kuhlman agreed to indemnify KEC and KAC for liabilities arising out of environmental claims filed by third-parties concerning the Crystal Springs site–subject to certain limitations to the right to indemnification, including KEC and KAC's duty to cooperate with BorgWarner and Kuhlman in connection with these matters. Specifically, section 11.5(e) of the 1999 merger agreement provides in pertinent part the following: "[KAC] will (i) notify [Kuhlman] and [BorgWarner] promptly after becoming aware of facts which may give rise to a claim by [KAC] in connection with any liability for [p]re-closing [e]nvironmental [m]atters relating to the [f]acilities of [KEC] located in *** Crystal Springs, Mississippi *** and (ii) cooperate with [Kuhlman] and [BorgWarner] in connection with such matters." Like the insureds in *Waste Management, Inc.*, KEC and KAC sought indemnification from BorgWarner and Kuhlman for millions of dollars in defense and settlement costs that incurred in the underlying tort actions. Like *Waste Management, Inc.*, BorgWarner and Kuhlman filed the instant lawsuit against KEC and KAC seeking a determination of their rights and liabilities under the merger agreement. During discovery, BorgWarner and Kuhlman requested documents and information from KEC and KAC that were relevant to the defense of the underlying tort actions for which KEC and KAC demanded indemnification. However, KEC and KAC refused to provide the documents. We find that, based on the holding of *Waste Management, Inc.*, the plain language of the 1999 merger agreement's "cooperation clause" created obligations requiring KEC and KAC to disclose to BorgWarner and Kuhlman relevant information and documents relating to the defense and settlement of the underlying tort actions, which BorgWarner and Kuhlman had the ultimate duty to satisfy. Similar to the "cooperation clause" in the *Waste Management, Inc.* insurance policies, KEC and KAC's duty to cooperate, as outlined in section 11.5(e) of the merger agreement, is broad and without limitation or qualification. Thus, we find that any expectation of attorney-client privilege was unreasonable. Likewise, because the requested materials were not prepared in anticipation of the instant lawsuit in which the discovery was sought, but rather in defense of the underlying tort actions against third-party adversaries, we find that the work-product doctrine was inapplicable.

¶ 27    Nonetheless, KEC and KAC argue against disclosure of the requested documents by claiming that the 1999 merger agreement did not grant BorgWarner and Kuhlman access to their privileged information. They contend that nothing in the provisions of section 11 of the merger agreement gave BorgWarner and Kuhlman a "clear, express contractual right to pierce the privilege and obtain KEC's attorney-client and work-product information." Pointing to section 11.4 of the merger agreement specifically, which is entitled "Third-Party Claims,"

KEC and KAC note that it did not impose on KEC and KAC any obligations–not even the duty to cooperate–but only conferred on KEC and KAC "the unfettered ability to defend against and settle [t]hird-[p]arty [c]laims if [BorgWarner and Kuhlman] fail to timely provide a satisfactory indemnity agreement [in writing], while still preserving KEC and KAC's right to receive indemnity from BorgWarner and Kuhlman." We reject this argument. To construe section 11.4 of the merger agreement as KEC and KAC suggest ignores the provisions under section 11.5 setting forth limitations to KEC and KAC's right to indemnification–limitations such as KEC and KAC's duty to cooperate. See *Paluch v. United Parcel Service, Inc.*, 2014 IL App (1st) 130621, ¶ 13 (when interpreting a contract, the court must read the entire contract in context and construe it as a whole, viewing each provision in light of the other ones instead of focusing on one clause or provision in isolation). As discussed, section 11.5(e), which is broad and without limitation or qualification, imposed upon KEC and KAC an obligation to cooperate–that is, to disclose to BorgWarner and Kuhlman relevant information relating to the defense and settlement of the underlying tort actions for which KEC and KAC demand indemnification. KEC and KAC neither challenged in the circuit court nor argue before this court that section 11.5(e) does not address their duty of cooperation on the underlying claims for which they seek indemnity.

¶ 28    KEC and KAC further dispute that section 11.5(e) of the merger agreement imposed a broad duty to cooperate by arguing that other provisions in the merger agreement, such as section 7.4(b), use the words "fully cooperate" in another context involving the submission of documents to taxing and governmental authorities. Thus, KEC and KAC surmise, because the parties chose the more limited phrase "cooperate" rather than "fully cooperate" in section 11.5(e), this showed that the parties did not intend for privileged information to be disclosed. We reject this contention. As the circuit court correctly noted, "there is no perceptible difference between a duty to 'cooperate' and a duty to 'fully cooperate' or provide 'full cooperation,' nor do [KEC and KAC] cite any case [law] to support the distinction they draw." We agree with the circuit court's assessment and reiterate that, similar to the cooperation clause in *Waste Management, Inc.*, the cooperation clause in the merger agreement here is without limitation or qualification. KEC and KAC further argue that, even if the cooperation clause under section 11.5(e) required disclosure of privileged information under certain circumstances, no disclosure was required in the present dispute because the clause did not require them to cooperate with BorgWarner and Kuhlman in connection with the Dickinson Wright litigation. We do not see how this in any way advances KEC and KAC's arguments against disclosure. The subject of the requested materials in the instant indemnification dispute pertained to the defense of the underlying tort actions and not the Dickinson Wright litigation.

¶ 29    KEC and KAC also argue that the 2004 JDCA, which was executed five years after the 1999 merger agreement, expressly barred disclosure of the privileged information that BorgWarner and Kuhlman now seek. In support of their argument, KEC and KAC specifically reference paragraphs 3 and 4 of the 2004 JDCA, which they assert show that they were not and could not be required to disclose the privileged information. KEC and KAC argue that, because BorgWarner and Kuhlman agreed, under the 2004 JDCA, that they could not require KEC or KAC to disclose "the very privileged information [BorgWarner and Kuhlman] now wrongly seek here," BorgWarner and Kuhlman's attempt to renege on their own "contractual promises" should be rejected. We disagree with KEC and KAC's misguided interpretation of the 2004 JDCA.

¶ 30 We find that the 2004 JDCA did not abrogate KEC and KAC's duty to cooperate under section 11.5(e) of the merger agreement. The 2004 JDCA was executed by BorgWarner, Kuhlman, KEC, and KAC in order to outline the parties' common interest relating to the underlying Mississippi tort actions and to reduce to writing the basis for the necessary exchange of privileged information in furtherance of their common interest in the underlying tort actions. The preamble of the 2004 JDCA states that the parties agreed to be bound by the JDCA as it related to all litigation brought by third parties against them alleging personal injury and property damage associated with contamination at the Crystal Springs site, as well as any claims by BorgWarner, Kuhlman, KEC or KAC against insurers relating to the underlying tort actions. Paragraph 3 of the 2004 JDCA provides in relevant part that "all [p]rivileged [i]formation or business or technical information *disclosed* by the parties shall be deemed confidential"; that any privileged information "*exchanged* or *communicated* between [BorgWarner and Kuhlman] or their counsel and KEC [and KAC] or their counsel in connection with the [underlying tort actions] shall be deemed subject to *this* [a]greement"; and that "nothing in *this* [a]greement shall require the [p]arties or their counsel to share any *such* [p]rivilege[d] [i]nformation." (Emphases added.) Paragraph 4 of the 2004 JDCA provides in relevant part that "[i]n order to protect the privileged and/or protected status of the [p]rivilged [i]nformation that *will be exchanged* pursuant to this [a]greement, the [p]arties and their respective counsel agree that they will not share, make available, disclose or communicate in any way any *such* [p]rivileged [i]nformation to any person or entity not a [p]arty without the consent of the disclosing [p]arty"; that [p]rivileged [i]nformation shall be used solely for the purpose of this [underlying tort litigation]"; and that disclosure of any privileged information "in violation of *this* [a]greement will cause the [p]arties to suffer irreparable harm for which there is not adequate legal remedy." (Emphases added.) We find that nothing in the 2004 JDCA modified or conflicted with KEC and KAC's duty to cooperate under section 11.5(e) of the merger agreement. Rather, it is clear that by using the terms "nothing in *this* [a]greement," the parties were addressing their obligations under the 2004 JDCA only. (Emphasis added.) Based on our examination of the plain language of these provisions in the 2004 JDCA, we find that the parties agreed that all privileged information that had already been disclosed or exchanged, or would be exchanged, between the parties shall be confidential, and that such information is prohibited from disclosure to a third party without the consent of the disclosing party. Because the terms of the 2004 JDCA did not abrogate KEC and KAC's preexisting duty to cooperate under section 11.5(e) of the merger agreement, and concerns regarding disclosure of privileged materials to third parties were not present here, we find that KEC and KAC were not entitled to relief on this basis. Further, we reject KEC and KAC's argument that the circuit court "incorrectly found the JDCA to be ambiguous." The circuit court made no such finding. Rather, it simply stated in the hypothetical that *even if* the JDCA was ambiguous, the evidence did not warrant a different conclusion.

¶ 31 Nor do we find persuasive KEC and KAC's assertion that BorgWarner and Kuhlman were prohibited from gaining access to the privileged information under a separate agreement executed by the parties in 2005–the 2005 cooperation agreement. The 2005 cooperation agreement was entered into by the parties "in the interest of efficiency, coordination and joint defense, *** for BorgWarner [and Kuhlman] to attempt to negotiate settlements (on an individual and/or global basis) that resolve the [p]arties' total liability in connection with claims brought and which may in the future be brought for damages allegedly arising from

- 11 -

alleged PCB (and/or other) contamination at or originating from KEC's Crystal Springs *** facility." KEC and KAC point to various provisions in the 2005 cooperation agreement in arguing that it did not require them to disclose privileged information to BorgWarner and Kuhlman and that it was governed by the terms of the 2004 JDCA. This argument does not advance KEC and KAC's position in any way. Paragraph 5 of the 2005 cooperation agreement specifies that "[t]his [a]greement shall not serve to modify, limit or enlarge any of the [p]arties' rights or obligations as set forth in the [m]erger [a]greement." We have already determined that, pursuant to the holding in *Waste Management, Inc.*, section 11.5(e) in the 1999 merger agreement required KEC and KAC to disclose the requested documents and that the 2004 JDCA did not modify KEC and KAC's duty to cooperate under the merger agreement. Thus, the 2005 cooperation agreement, which did not modify, limit, or enlarge the parties' rights or obligations in the 1999 merger agreement or in the 2004 JDCA, did not extinguish KEC and KAC's duty to cooperate with BorgWarner and Kuhlman.

¶ 32    KEC and KAC further challenge the circuit court's order compelling disclosure of the requested information by arguing that two other courts–the circuit court in the Dickinson Wright litigation and in an underlying Mississippi action–had denied BorgWarner and Kuhlman access to the same privileged information. We find this argument to be forfeited, where KEC and KAC, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008), cite no legal authority to support their argument that this court is bound by the discovery rulings of circuit courts in other lawsuits and jurisdictions. See *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889, ¶¶ 80-82 (failure to cite legal authority in violation of Rule 341(h)(7) results in forfeiture of the issue). Thus, we need not address this argument any further.

¶ 33    KEC and KAC also argue against disclosure of the requested materials, by noting that the policy concerns underlying our supreme court's *Waste Management, Inc.* decision–such as the prevention of collusion between the insured and the injured party–were not present in the case at bar. They contend that "extending" *Waste Management, Inc.*'s holding to include "standard indemnity clauses" such as the ones at issue here would be "problematic and dangerous," and they cite *Hartz Construction Co. v. Village of Western Springs*, 2012 IL App (1st) 103108, for support. To the extent that KEC and KAC suggest that the holding of *Waste Management, Inc.* only applies to cases involving insurance companies, rather than other types of indemnitors such as BorgWarner and Kuhlman, we reject this contention. This court in *Hartz Construction Co.* has already rejected such a limitation. *Hartz Construction Co.*, 2012 IL App (1st) 103108, ¶ 30 (parties do not have to match the classic profile of an insurer and insured for the concepts in *Waste Management, Inc.* to apply). Further, we find *Hartz Construction Co.* to be inapposite, where, there, the indemnity contract did not contain any express language mandating a duty of cooperation. By contrast, the 1999 merger agreement here contains an express duty to cooperate, similar to the cooperation clause in *Waste Management, Inc.* As discussed, we find the holding in *Waste Management, Inc.* to be dispositive. Thus, we find that KEC and KAC are not entitled to relief on this basis.

¶ 34    In light of our determination that the attorney-client privilege and the work-product doctrine were inapplicable to bar production of the requested materials, we need not address the circuit court's other independent bases (the "common interest" doctrine and the "at issue" waiver) for compelling disclosure. Also, it bears noting that, as the circuit court correctly found in its February 21, 2013 order, any privileged communications and materials "generated in

- 12 -

preparation for the defense and prosecution of the indemnity claims, including the *present* indemnity dispute," are protected from disclosure. (Emphasis added.) See *Waste Management, Inc.*, 144 Ill. 2d at 200-01 (holding that the protections under the attorney-client privilege and work-product doctrine are nonetheless "available to bar disclosure of any communications or materials generated in preparation for the present declaratory judgment action").

¶ 35    Accordingly, we hold that the circuit court properly ordered disclosure of the documents relating to the underlying environmental matters in 22 out of the 28 categories identified in KEC and KAC's privilege log (categories 1 through 3, 5 through 8, 11 through 21, 24, and 26 through 28). KEC and KAC posit that regardless of the outcome of this appeal, we should vacate the circuit court's May 2, 2013 order of contempt and the accompanying fine against them because they acted in good faith in seeking review of the February 21, 2013 order concerning the privileges in question. We agree with the circuit court's assessment that KEC and KAC were "acting in good faith for purposes of seeking an appeal under Supreme Court Rule 304(b)." Thus, although we affirm the circuit court's February 21, 2013 ruling, we find it appropriate to vacate the finding of contempt and the $100 fine. See *Allianz Insurance Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 677 (2007) ("[w]here a party's refusal to comply with a trial court's order constitutes a good-faith effort to secure an interpretation of the privileges in question, it is appropriate to vacate a contempt citation on appeal").

¶ 36    For the foregoing reasons, we affirm the circuit court's February 21, 2013 order compelling KEC and KAC to disclose the requested materials to BorgWarner and Kuhlman, but vacate the circuit court's May 2, 2013 order of contempt and imposition of fine against KEC and KAC.

¶ 37    Affirmed in part; vacated in part.